1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SANTY SAYAVANH,

                 Plaintiff,

              v.

CITY OF TUKWILA, et al.,

                 Defendants.

CASE NO. C11-0038JLR

ORDER ON DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT

## I.      INTRODUCTION

      This matter comes before the court on Defendants City of Tukwila ("the City"),

Ceith Cullens, and Douglas Johnson's motion for summary judgment (Dkt. # 11).  Mr.

Cullens and Mr. Johnson are both police officers with the Tukwila Police Department.

(Cullens Decl. (Dkt. # 13) ¶ 2; Johnson Decl. (Dkt. # 14) ¶ 2.)  Having considered the

submissions of the parties, the balance of the record, and the relevant law, and neither

party having requested oral argument, the court GRANTS in part and DENIES in part

Defendants' motion (Dkt. # 11).

## II.    BACKGROUND

At approximately 2:00 a.m. on August 8, 2010, five officers from the Tukwila Police Department, including Officers Cullens and Johnson, were dispatched to a fight in the parking lot of a casino that involved approximately ten subjects.  (Cullens Decl. ¶ 4; Johnson Decl. ¶ 5.)  The officers responded to the call in marked police vehicles and with their lights and sirens activated.  (Johnson Decl. ¶ 5.)  One of the police vehicles contained a dashboard video camera that recorded some of the subsequent events.[1]  (*See* Not. of Filing of Physical Materials (Dkt. # 10) ("COBAN Video").)  The video recording provided to the court does not have audio.

When the officers arrived at the casino, there were many people in the parking lot and it was full of vehicles.  (Cullens Decl. ¶ 4; Johnson Decl. ¶ 5.)  The police vehicle that was equipped with the video camera parked on the side of the casino facing the rear of the parking lot.  (COBAN Video at 2:17-2:36.)  The video camera recorded a section of the parking lot that included an expanse of asphalt on the left and approximately five vehicles parked in a row on the right.  (*Id.* at 2:36.)  The vehicle that was parked farthest from the video camera and at the end of the row was a blue truck.  (*Id.*)

A few seconds after the police vehicle arrived, the video recording depicts Mr. Sayavanh walking by the row of cars on the right with his hands in his pockets.  (*Id.* at 2:41.)  Mr. Sayavanh is five feet, seven inches tall and weighs 130 pounds.  (Ragonesi

---

[1] "Where video evidence contradicts a party's version of the events, on a motion for summary judgment a court must accept as depicted the video provided . . . ."  *Fillmore v. Sharp*, No. 2:10cv00620 JWS, 2011 WL 5191369, at *3 (D. Ariz. Nov. 2, 2011) (citing *Scott v. Harris*, 550 U.S. 372, 380-81 (2007)).

Decl. (Dkt. # 12) at 16.)  On the video, he is walking slowly between the parked cars and appears to be looking for something.  (COBAN Video at 2:41-3:50.)  Mr. Sayavanh testified that he had lost his cell phone and was looking for it.  (Ragonesi Decl. at 4 (Sayavanh Dep. at 24:1-2).)  For the next few minutes, the video recording shows Mr. Sayavanh walking around the parking lot apparently looking for his cell phone. (COBAN Video at 2:42-5:06.)

Meanwhile, Officer Johnson was in a different area of the parking lot assisting with the arrest of a man who was later identified as Andy Somvilay, a cousin of Mr. Sayavanh.  (Johnson Decl. ¶ 5.)  When the police arrived at the casino, Mr. Somvilay was in the parking lot and looked as though he had been involved in an altercation.  (*Id.*)  Mr. Somvilay failed to comply with Officer Johnson's repeated orders to sit down and resisted another officer's physical attempt to take him to the ground.  (*Id.*)  As a result, Officer Johnson delivered a single blast of pepper spray to Mr. Somvilay's face and then assisted with handcuffing him.  (*Id.*)

After Mr. Somvilay was detained, Officer Cullens observed a female nearby who appeared to be concerned for Mr. Somvilay.  (Cullens Decl. ¶ 4.)  Officer Cullens later learned that the female was related to both Mr. Somvilay and Mr. Sayavanh (*id.* at 2 n.1), and Mr. Sayavanh's complaint indicates that her name is Khanthala Somvilay and that she and Mr. Sayavanh are cousins (Compl. ¶ 4.5).[2]  Officer Cullens began to interview Ms. Somvilay, and as they were talking, they walked away from where Mr. Somvilay had

_____

[2] The record does not indicate the relationship between Mr. Somvilay and Ms. Somvilay.

been detained and toward the blue truck depicted in the video recording. (Cullens Decl. ¶ 4.)

At this point, the video recording depicts Mr. Sayavanh on the left side of the camera frame. (COBAN Video at 5:06.) He appears to be talking with someone off camera, and he gestures to this person with his arms out to his sides. (*Id.*) Officer Cullens testified that Mr. Sayavanh tried to get his attention about looking for the missing cell phone. (Cullens Decl. ¶ 4.) Officer Cullens testified that he told Mr. Sayavanh that he would talk to Mr. Sayavanh after he was finished with his investigation of the assault because that was more important. (*Id.*)

A few seconds later, the video shows Ms. Somvilay and Officer Cullens walking over to the blue truck and inspecting it. (COBAN Video at 5:13-5:23.) According to Officer Cullens, the blue truck appeared to have been in a collision, and Ms. Somvilay was explaining to him that it belonged to Mr. Somvilay and that Mr. Somvilay's friend had crashed it. (Cullens Decl. ¶ 5.) As Officer Cullens and Ms. Somvilay inspected the blue truck, the video shows Mr. Sayavanh walking over to the row of parked cars, and continuing his search for his lost cell phone. (COBAN Video at 5:23-5:39.) Officer Cullens testified that Mr. Sayavanh was yelling occasionally about his cell phone being lost. (Cullens Decl. ¶ 5.)

After inspecting the blue truck, the video shows Officer Cullens and Ms. Somvilay standing near the rear of the truck and continuing the interview. (COBAN Video at 5:39.) In the video, Officer Cullens removes his notepad from his pocket and begins to take notes. (*Id.*; Cullens Decl. ¶ 5.) While Officer Cullens is still interviewing Ms.

Somvilay, the video shows Mr. Sayavanh walking towards them.  (COBAN Video at 5:44.)  Mr. Sayavanh is approximately four cars away from them when he begins to walk in their direction.  (*Id.*)  According to Officer Cullens, Mr. Sayavanh yelled something about his phone as he walked towards them.  (Cullens Decl. ¶ 5.)  Mr. Sayavanh testified that he yelled "hey, have you seen my cell phone?" to Ms. Somvilay—not to Officer Cullens.  (Ragonesi Decl. at 5 (Sayavanh Dep. at 25:1-2).)  Mr. Sayavanh testified that Ms. Somvilay looked at him but did not give him a verbal response.  (*Id.* (Sayavanh Dep. at 25:7-13).)  Officer Cullens also testified that he looked up at Mr. Sayavanh and then looked back at his notebook.  (Cullens Decl. ¶ 5.)

After failing to get a response from Ms. Somvilay, Mr. Sayavanh testified that he continued to walk toward her and Officer Cullens.  (Ragonesi Decl. at 5 (Sayavanh Dep. at 25:16); COBAN Video at 5:44-53.)  The video shows that Mr. Sayavanh's hands are down at his sides as he walks but that several times he opens his palms toward Officer Cullens and Ms. Somvilay and moves his extended arms out to his sides in a small gesture.  (COBAN Video at 5:44-53.)  When he is almost to the blue truck, the video shows him making a larger gesture with his arms out to his sides and then hiking up his pants.  (*Id.* at 5:54.)  He then continues to walk toward Officer Cullens and Ms. Somvilay, but at a slightly slower speed than before.  (*Id.* at 5:55.)

Officer Cullens testified that as Mr. Sayavanh walked toward them, Mr. Sayavanh yelled again about the lost cell phone and that when he told Mr. Sayavanh that he "did not care right now," Mr. Sayavanh yelled, "What did you say?"  (Cullens Decl. ¶ 6.)  Officer Cullens further testified that Mr. Sayavanh then dropped his hands down to his

sides and started walking straight at the officer.  (*Id.*)  According to Officer Cullens, Mr.

Sayavanh "was puffing out his chest and staring through me."  (*Id.*)  In contrast, Mr.

Sayavanh testified that he "just walked towards them" and that he and Officer Cullens did

not say anything to each other.  (Ragonesi Decl. at 5-6 (Sayavanh Dep. at 25:14-24, 26:1-

3).)  The video evidence does not resolve these disputed facts, and on a motion for

summary judgment, the court must credit Mr. Sayavanh's version of events.

When Mr. Sayavanh is approximately two large steps away from Officer Cullens,

the video shows Officer Cullens suddenly throwing down his notepad and taking one

large step toward Mr. Sayavanh.  (COBAN Video at 5:56-57.)  The video shows that

Officer Cullens contacts Mr. Sayavanh's chest with his palms and then takes several steps

forward as he shoves Mr. Sayavanh hard to the ground.  (*Id.* at 5:57-59.)  Approximately

13 seconds passed between time when Mr. Sayavanh began to walk toward Officer

Cullens and Ms. Somvilay and the moment when Officer Cullens first made contact with

Mr. Sayavanh's body.  (*Id.* at 5:44-57.)

The video shows Mr. Sayavanh landing on his back, and his feet coming up into

the air.  (*Id.* at 5:58-6:00.)  Officer Cullens pushes Mr. Sayavanh's feet to the side and

grabs Mr. Sayavanh's right arm as he attempts to roll Mr. Sayavanh over in order to

apply handcuffs.  (*Id.* at 6:00-01.)  Officer Cullens testified that he gave Mr. Sayavanh

oral commands to comply and turn around.  (Cullens Decl. ¶ 8.)  Viewing the video

evidence in the light most favorable to Mr. Sayavanh, it appears that he resisted Officer

Cullens's initial attempts to roll him onto his stomach and bring his right arm behind his

back, but that he did not attempt to kick or hit Officer Cullens or otherwise escape. (COBAN Video at 6:00-02.)

The video next shows Officer Johnson running over to assist Officer Cullens. (*Id.* at 6:00-6:03.) When Officer Johnson arrives at Officer Cullens's side, the video shows that Mr. Sayavanh is on his stomach, his right hand is behind his back, and his left hand appears to be pinned under his body. (*Id.* at 6:02-03.) The video shows Officer Johnson bending down over Mr. Sayavanh (*id.* at 6:06), and Officer Johnson testified that he tased Mr. Sayavanh on his right hip in drive-stun mode (Johnson Decl. ¶ 6). Mr. Sayavanh testified that Officer Johnson tased him three times for approximately two to three seconds each time (Ragonesi Decl. at 17 (Sayavanh Dep. at 31:9-12)), while Officer Johnson testified that he only tased Mr. Sayavanh twice (Johnson Decl. ¶6). The tasings occurred within the 30 seconds during which Officer Johnson was bent over Mr. Sayavanh, but the video recording does not show the tasings themselves. (COBAN Video at 6:06-6:35.) Mr. Sayavanh testified that the tasings "hurt" and that he felt like he was "getting electrocuted." (Ragonesi Decl. at 17 (Sayavanh Dep. at 31:21-23).)

After Officer Johnson tased Mr. Sayavanh, the officers placed him in handcuffs.[3] (Johnson Decl. ¶ 6.) Officer Cullens told Mr. Sayavanh that he was under arrest, assisted

_____

[3] Mr. Sayavanh alleged in his complaint that Officer Johnson tased him after he was handcuffed. (Compl. ¶ 4.10.) Mr. Sayavanh, however, cannot oppose a properly supported summary judgment motion by resting on the allegations in his pleadings, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986), and in opposing Defendants' motion for summary judgment, Mr. Sayavanh did not submit evidence that Officer Johnson tased him after he was handcuffed. Accordingly, Mr. Sayavanh has not satisfied his burden to create a genuine issue of material fact on this question.

him in standing up, and walked him over to Officer Cullens's police vehicle. (Cullens Decl. ¶ 9.) According to Officer Cullens, Mr. Sayavanh complained of having a "scratch" on his cheek, so Officer Cullens brought a medic over to examine Mr. Sayavanh. (*Id.*)

Mr. Sayavanh was charged in Tukwila Municipal Court with obstructing an officer and resisting arrest. (Ragonesi Decl. at 13-14.) He stipulated to probable cause, and the case was dismissed with prejudice. (*Id.* at 16.)

On December 6, 2010, Mr. Sayavanh filed the instant action in the Washington State Superior Court for King County. (Compl.) Mr. Sayavanh brought state law claims for assault and battery against Officers Cullens and Johnson, as well as 42 U.S.C. § 1983 excessive force claims against the officers. (*Id.* ¶¶ 5.1-5.11.) Mr. Sayavanh also brought a vicarious liability claim against the City. (*Id.* ¶¶ 5.12-5.14.) Defendants timely removed to this court (Not. of Removal (Dkt. # 1)), and have now filed a motion for summary judgment seeking dismissal of all of Mr. Sayavanh's claims (Mot. (Dkt. # 11)). The motion is fully briefed and ripe for the court's consideration.

## III.    ANALYSIS

### A. Summary Judgment Standard

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007). The moving party bears the initial burden of

showing that there is no genuine issue of material fact and that he or she is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323. If the moving party meets his or her burden, then the non-moving party "must make a showing sufficient to establish a genuine dispute of material fact regarding the existence of the essential elements of his case that he must prove at trial" in order to withstand summary judgment. *Galen*, 477 F.3d at 658. The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The court is "required to view the facts and draw reasonable inferences in the light most favorable to the [non-moving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007).

**B. Mr. Sayavanh's § 1983 Claims for Excessive Force Against the Officers**

The court begins by considering Defendants' motion for summary judgment based on the officers' assertion of qualified immunity. Qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights about which a reasonable person would have known. *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (en banc) (citing *Pearson v. Calahan*, 555 U.S. 223, 231 (2009)). In determining whether an official is entitled to qualified immunity, courts apply a two-step test: First, the court must determine if, taking the facts in the light most favorable to the non-moving party, the officer violated one of the plaintiff's constitutional rights. *Id.* Second, if the answer to the first question is "yes," then the court must "determine whether the constitutional right was 'clearly established in light of the specific context of the case' at the time of the

events in question." *Id.* (quoting *Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009));
*see also Bryan v. MacPherson*, 630 F.3d 805, 823 (9th Cir. 2010).

All allegations that law enforcement officers have used excessive force are examined under the Fourth Amendment and its reasonableness standard, and the framework outlined by the Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989). *Smith v. City of Hemet*, 394 F.3d 689, 700 (9th Cir. 2005). The Supreme Court has declared that the "reasonableness" inquiry is whether the officer's actions are "objectively reasonable" in light of the facts and circumstances confronting him or her. *Graham*, 490 U.S. at 397. The court applies *Graham* by first considering the nature and quality of the alleged intrusion, and then considering the governmental interests at stake by looking at: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Mattos*, 661 F.3d at 441.

The court's consideration of reasonableness, however, is not limited to these three factors. Rather, the court must consider the totality of the circumstances and weigh the gravity of the intrusion against the government's interest to determine whether the force employed was constitutionally reasonable. *See Miller v. Clark Cnty.*, 340 F.3d 959, 968 (9th Cir. 2003); *see also Mattos*, 661 F.3d at 441 ("[I]n assessing the governmental interests at stake under *Graham*, we are free to consider issues outside the three enumerated . . . when additional facts are necessary to account for the totality of circumstances in a given case."). "In some cases . . . , the availability of alternative

methods of capturing or subduing a suspect may be a factor to consider." *Smith*, 394 F.3d at 701.

Furthermore, reasonableness "must be judged from the perspective of a reasonable officer, on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396; *Drummond v. City of Anaheim*, 343 F.3d 1052, 1058 (9th Cir. 2003). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97; *see also Mattos*, 661 F.3d at 442. Because "[n]ot every push or shove, even if it may seem unnecessary in the peace of the judge's chambers, . . . violates the Fourth Amendment," *Graham*, 490 U.S. at 396, "[n]either tackling nor punching a suspect to make an arrest necessarily constitutes excessive force," *Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007). "Force is excessive when it is greater than is reasonable under the circumstances." *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002). "When the circumstances show that there is no need for force, any force used is constitutionally unreasonable." *Sanders v. City of Fresno*, 551 F. Supp. 2d 1149, 1166 (E.D. Cal. 2008) (citing *Fontana v. Haskin*, 262 F.3d 871, 880 (9th Cir. 2001), and *Motley v. Parks*, 432 F.3d 1072, 1089 (9th Cir. 2005)); *cf. P.B. v. Koch*, 96 F.3d 1298, 1303 n.4 (9th Cir. 1996). "Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, . . . summary judgment . . . in excessive force cases should be granted sparingly." *Mattos*, 661 F.3d at 441 (citing *Santos*, 287 F.3d at 853).

Here, Mr. Sayavanh has alleged that Officer Cullens used excessive force when he shoved Mr. Sayavanh to the pavement, and that Officer Johnson used excessive force when he tased Mr. Sayavanh multiple times. (Compl. ¶¶ 5.7-5.11.) The court analyzes each allegation of excessive force separately.

### 1. Officer Cullens's Shove

First, the court must determine whether, viewing the evidence in Mr. Sayavanh's favor, a reasonable jury could conclude that Officer Cullens violated Mr. Sayavanh's Fourth Amendment rights when he shoved Mr. Sayavanh to the ground. The court begins its analysis by considering the nature and quality of the force used against Mr. Sayavanh. *See Mattos*, 661 F.3d at 443. The video evidence shows that Officer Cullens took a quick step towards Mr. Sayavanh, placed his open hands on Mr. Sayavanh's chest, and then took several steps forward as he shoved Mr. Sayavanh to the ground hard. (COBAN Video at 5:56-6:00.) Officer Cullens then forced Mr. Sayavanh onto his stomach and handcuffed his hands behind his back. (*Id.* at 6:00-35.) At the very least, these actions caused minor injury to Mr. Sayavanh's face. (Cullens Decl. ¶ 9.)

Defendants contend that Officer Cullens used a "push-pull" defensive technique on Mr. Sayavanh and that this is a level one, or lowest level, use of force. (Mot. at 11-12.) This argument, however, does not accurately reflect Officer Cullens's testimony. Officer Cullens testified that he attempted to use a "push-pull" tactic but that when this was unsuccessful, he proceeded simply to "push" Mr. Sayavanh to the ground. (Cullens Decl. ¶¶ 7-8.) Indeed, viewing the video evidence in Mr. Sayavanh's favor, it does not appear that Officer Cullens ever attempted to "pull" Mr. Sayavanh, only that he pushed

Mr. Sayavanh.  (*See* COBAN Video at 5:56-59.)  Nevertheless, the court concludes that

Officer Cullens used a low level of force against Mr. Sayavanh.  *See Josfan v. Indochine*,

No. CV 09-07904 AHM (PLAx), 2012 WL 113371, at *9 (C.D. Cal. Jan. 13, 2012)

(finding that officers who physically grabbed the plaintiff, forced him to the ground, and

handcuffed him caused a "limited and slight" imposition on the plaintiff's Fourth

Amendment rights).

Next, the court considers the governmental interests at stake.  The first *Graham*

factor is the severity of the crime at issue.  Mr. Sayavanh was ultimately charged with

obstructing an officer and resisting arrest.  (Ragonesi Decl. at 13-14.)  At the time when

Officer Cullens shoved Mr. Sayavanh to the ground, the only crime at issue was

obstructing an officer.  This is not a serious offense.  *See Davis v. City of Las Vegas*, 478

F.3d 1048, 1055 (9th Cir. 2007) (noting that trespassing and obstructing a police officer

are not severe crimes).

The second *Graham* factor is whether Mr. Sayavanh "posed an immediate threat

to the safety of the officers or others."  *Mattos*, 661 F.3d at 445 (citation omitted).  As

noted above, this is the "most important single element" of the governmental interests at

stake.  *Id.* at 445 (quoting *Smith*, 384 F.3d at 702).  "A simple statement by an officer that

he fears for his safety or the safety of others is not enough; there must be objective

factors to justify such a concern."  *Bryan*, 360 F.3d at 826 (quoting *Delore v. Rutherford*,

272 F.3d 1272, 1281 (9th Cir. 2001)).  When Mr. Sayavanh first yelled to Ms. Somvilay

to ask her whether she had seen his cell phone, he was over ten feet away from her and

Officer Cullens.  (*See* Ragonesi Decl. at 7 (Sayavanh Dep. at 27:8-10).)  Officer Cullens

1   responded by looking up at Mr. Sayavanh and then looking back at his notebook.

2   (Cullens Decl. ¶ 5.)  At this point, the court has little difficulty concluding that Mr.

3   Sayavanh was not an immediate threat to anyone.

4        After failing to get a response from Ms. Somvilay, Mr. Sayavanh continued to

5   walk toward her and Officer Cullens.  (Ragonesi Decl. at 5 (Sayavanh Dep. at 25:16);

6   COBAN Video at 5:44-53.)  Mr. Sayavanh's actions in the next few seconds are in

7   dispute.  Mr. Sayavanh testified that he "just walked towards them" and that neither he

8   nor Officer Cullens spoke any words to each other.  (Ragonesi Decl. at 5-6 (Sayavanh

9   Dep. at 25:14-24, 26:1-3).)  In contrast, Officer Cullens testified Mr. Sayavanh continued

10  to yell about his lost cell phone as he approached and that he responded aggressively

11  when Officer Cullens stated that he "did not care right now" about the missing cell

12  phone.  (Cullens Decl. ¶ 6.)  Officer Cullens also testified that Mr. Sayavanh "was

13  puffing out his chest and staring through me" and that Mr. Sayavanh's actions and

14  demeanor indicated that he was going to attack Officer Cullens.  (*Id.* ¶ 7.)  The video

15  evidence shows that Mr. Sayavanh made several gestures with his arms as he walked

16  toward Officer Cullen, but it does not show whether they spoke to each other.

17       On summary judgment, the court must view the evidence in the light most

18  favorable to Mr. Sayavanh and credit his version of the facts over any conflicting

19  testimony.  Doing so, the court concludes that a reasonable jury could find that a

20  reasonable officer on the scene would have understood that Mr. Sayavanh was not an

21  immediate threat to anyone's safety.  In fact, a reasonable jury could conclude that

22  Officer Cullens's use of force was unprovoked.  Mr. Sayavanh was not walking at a fast

pace, his hand gestures are consistent with a person who was exasperated about being unable to find a lost cell phone, and it does not appear in the video that he ever balled his fists or made any threatening gestures toward Officer Cullens.  Particularly in light of Mr. Sayavanh's testimony that Officer Cullens did not give him any verbal commands at this time, a reasonable officer on the scene could have assumed that Mr. Sayavanh was walking over to ask a question, rather than to assault an officer.

The third *Graham* factor is whether the suspect was actively resisting arrest or attempting to evade arrest by flight.  When Officer Cullens pushed Mr. Sayavanh, the evidence shows that he was neither resisting arrest nor attempting to flee.

Finally, the court "must examine the totality of the circumstances and consider 'whatever specific factor may be appropriate in a particular case, whether or not listed in *Graham*.'"  *Mattos*, 661 F.3d at 445 (quoting *Bryan*, 630 F.3d at 826 (quotation omitted)).  Although the court recognizes that officers must "make split-second judgments . . . about the amount of force that is necessary in a particular situation," *Graham*, 490 U.S. at 396-97, the court considers it relevant in this case that there is no evidence in the record that Officer Cullens gave Mr. Sayavanh any verbal command to stop walking toward him and Ms. Somvilay.  Even if the court credited Officer Cullens's testimony that he told Mr. Sayavanh that he "did not care right now" about the lost cell phone, this was not an order that Mr. Sayavanh should stop his approach, nor was it a warning that the officer would use physical force on him.

In weighing the governmental interests at stake against the level of force employed, the court concludes that a reasonable jury could determine that Officer Cullens

used excessive force against Mr. Sayavanh, thereby violating his Fourth Amendment rights. Although Officer Cullens used a low level of force, the evidence, when viewed in Mr. Sayavanh's favor, supports a finding that none of the *Graham* factors weigh in the officer's favor. Indeed, a reasonable jury could determine that no use of force was justified under the circumstances and that Officer Cullens's use of force was unprovoked.

Because summary judgment on Mr. Sayavanh's excessive force claim is unwarranted, the court must determine whether Officer Cullens nevertheless is entitled to qualified immunity because the alleged constitutional violation described above was not "'sufficiently clear' that every 'reasonable official would have understood that what he [was] doing violate[d] that right.'" *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quoting *Anderson v. Creighton*, 483, U.S. 635, 640 (1987)). The law must be clearly established such that it would "be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001), *overruled on other grounds by Pearson*, 555 U.S. at 223. The court does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 131 S. Ct. at 2083.

"The Supreme Court and Ninth Circuit have found that an unprovoked use of force is unreasonable under the Fourth Amendment in the absence of any resistance, attempt at flight, danger to the officer, or any other exigent circumstance." *Newman v. San Joaquin Delta Cmty. Col. Dist.*, No. CIV. 2:09-3441 WBS KJN, 2010 WL 2179964, at *4 (E.D. Cal. May 27, 2010) (denying motion to dismiss the plaintiff's excessive force claim based on qualified immunity and citing *Graham*, 490 U.S. at 397; *Tennessee v.*

*Garner*, 471 U.S. 1, 8-9 (1985); *Robinson v. Solano Cnty.*, 278 F.3d 1007, 1014 (9th Cir. 2002); *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 927 (9th Cir. 2000)).

"[P]olice officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever." *Id.* (quoting *Lanigan v. Vill. of E. Hazel Crest, Ill.*, 110 F.3d 467, 475 (7th Cir. 1997)). "Given this history, any reasonable officer would know that he or she does not have the right to drag a person to the ground and pin that person there in the absence of flight, provocation, or other exigent circumstances." *Id.* The court therefore concludes that Mr. Sayavanh had a clearly established right to be free from allegedly unprovoked force by being shoved to the ground and that Officer Cullens is not entitled to summary judgment based on qualified immunity.[4] Accordingly, the court denies Defendants' motion for summary judgment with respect to Mr. Sayavanh's § 1983 claim against Officer Cullens.

### 2. Officer Johnson's Use of His Taser

Next, the court must determine whether Officer Johnson violated Mr. Sayavanh's constitutional rights when he tased Mr. Sayavanh. As with Mr. Sayavanh's excessive force claim against Officer Cullens, the court begins by considering the nature and

---

[4] Defendants cite *Hinton v. City of Elwood*, 997 F.2d 774 (10th Cir. 1993), in support of their argument that Officer Cullens is entitled to qualified immunity. (Mot. at 14-15). In *Hinton*, the police officers wrestled the plaintiff to the ground after he shoved a police officer and then walked away when he was told that he was under arrest. *Hinton*, 997 F.2d at 776-77. The Tenth Circuit found that the officers did not violate any constitutional right. *Id.* at 782. The facts precipitating the officers' use of force in *Hinton*, however, are distinguishable from those in the instant case. Whereas the plaintiff in *Hinton* assaulted an officer and ignored the officers' commands before there was a use of force, in this case, a reasonable jury could find that Officer Cullens's use of force against Mr. Sayavanh was unprovoked and that Mr. Sayavanh did not disregard any orders. As such, *Hinton* does not dictate a finding that Officer Cullens's actions were reasonable or that he is entitled to qualified immunity.

1  quality of the force use against Mr. Sayavanh.  *See Mattos*, 661 F.3d at 443.  Officer

2  Johnson tased Mr. Sayavanh either two or three times using the Taser's drive-stun mode.

3  (Ragonesi Decl. at 17 (Sayavanh Dep. at 31:9-12); Johnson Decl. ¶ 6.)  In *Mattos,* the

4  Ninth Circuit declined to determine what level of force specifically is used when a Taser

5  is used in drive-stun mode.  *Mattos*, 661 F.3d at 443.  Nevertheless, the Ninth Circuit

6  proceeded to determine whether the officer's use of the Taser against the plaintiff was

7  reasonable, "keeping in mind the magnitude of the electric shock at issue and the extreme

8  pain that [the plaintiff] experienced."  *Id.*  Accordingly, this court also proceeds to

9  examine the governmental interest in light of Officer Johnson's use of his Taser in drive-

10  stun mode.  The court also takes into account the fact that the Tukwila Police Department

11  considers a Taser application in drive-stun mode to be a low level pain compliance

12  technique and a low level use of force.  (Johnson Decl. ¶ 7.)

13      With respect to the first *Graham* factor, the underlying crime was obstructing an

14  officer, and, as discussed above, this is not a serious offense.[5]  Consideration of the

15  second two *Graham* factors, however, demonstrates that at least some force was justified

16  under the circumstances.  First, viewing the video evidence in Mr. Sayavanh's favor,

17  there is no reasonable dispute that Officer Cullens was struggling on the ground with Mr.

18  Sayavanh when Officer Johnson rushed over to assist.  (COBAN Video at 6:00-6:06.)

19  Even though the video evidence does not show that Mr. Sayavanh ever attempted to

20

21      _____

        [5] The court recognizes that Mr. Sayavanh was also charged with resisting arrest, and the
22  court considers this fact below in discussing the third *Graham* factor—whether Mr. Sayavanh
    was actively resisting arrest or attempting to evade arrest.

ORDER- 18

strike either officer, a reasonable officer on the scene could have believed that Mr.

Sayavanh posed an immediate threat to Officer Cullens.  In addition, the video evidence

shows that Mr. Sayavanh resisted Officer Cullens's initial attempt to roll him onto his

stomach and pull his right arm behind his back in order to handcuff him.  (*Id.* at 6:00-02.)

It is not apparent from the video evidence, however, that Mr. Sayavanh attempted to flee.

Finally, the court considers as an additional factor the number of tasings Mr.

Sayavanh experienced and the time period in which he received them.  *Baird v. Ehlers*,

No. C10-1540JLR, 2011 WL 5838431, at *9 (W.D. Wash. Nov. 21, 2011).  Mr.

Sayavanh testified that Officer Johnson tased him three times for approximately two to

three seconds each time.  (Ragonesi Decl. at 17 (Sayavanh Dep. at 31:9-12).)  The video

evidence shows that Officer Johnson was only bent over Mr. Sayavanh for 30 seconds,

therefore all tasings occurred during this window of time.  (*Id.* at 6:06-6:35.)  In *Mattos*,

the Ninth Circuit found that the officer's tasing of the plaintiff three times over the course

of less than one minute was an "overwhelmingly salient factor."  *Mattos*, 661 F.3d at 445.

The court reasoned that "[t]hree tasings in such rapid succession provided no time for

[the plaintiff] to recover from the extreme pain she experienced, gather herself, and

reconsider her refusal to comply [with the officer's orders]."  *Id.*; *see also Beaver v. City

of Fed. Way*, 507 F. Supp. 2d 1137, 1149 (W.D. Wash. 2007), *aff'd*, 301 Fed. Appx. 704

(9th Cir. 2008) ("[A]ny decision to apply multiple applications of a Taser must take into

consideration whether a suspect is capable of complying with an officer's commands.").

In considering the totality of the circumstances, the court determines that Officer

Johnson's first use of the Taser was objectively reasonable given that Mr. Sayavanh was

resisting Officer Cullens.  There are questions of fact, however, regarding whether the second and third applications of the Taser were excessive.  It is unclear from the record whether Officer Johnson gave Mr. Sayavanh an opportunity to recover from each tasing and comply with Officer Cullens's verbal commands, and whether Mr. Sayavanh continued to be an immediate threat to any officer or continued to resist arrest after the first tasing.

Nevertheless, the court concludes that Officer Johnson is entitled to qualified immunity because it was not clearly established at the time that his use of the Taser could violate Mr. Sayavanh's Fourth Amendment rights.  In March 2010, just a few months before the incident giving rise to this lawsuit, a three-judge panel of the Ninth Circuit decided *Brooks v. City of Seattle*, 599 F.3d 1018 (9th Cir. 2010), which was later superseded by the en banc decision in *Mattos*, 661 F.3d at 433.  In *Brooks*, the court held that the officers acted reasonably when they tased a pregnant woman three times in drive-stun mode after she refused orders to sign a traffic citation and get out of her car.  *Brooks*, 599 F.3d at 1030.  The plaintiff in *Brooks* had resisted arrest by tightening her grip on the steering wheel so that the officers could not remove her from the car.  *Id.*

*Brooks* and the instant case are similar in that they both involve originating offenses that were not serious and plaintiffs who resisted arrest but did not act violently toward the officers.  Further, they each involved the application of a Taser in drive-stun mode to the plaintiff three times within a short period of time.  In light of the *Brooks* decision, it was not clearly established in August 2010 that Officer Johnson's use of the Taser in drive-stun mode against Mr. Sayavanh could violate Mr. Sayavanh's

1    constitutional rights.  *See Mattos*, 661 F.3d 433 (reversing the panel decision in *Brooks*

2    and holding that the plaintiff alleged a constitutional violation but that the officers were

3    entitled to qualified immunity because the alleged violation was not clearly established).

4    Therefore, the court grants Defendants' motion for qualified immunity with respect to

5    Officer Johnson.

6    **C. Mr. Sayavanh's Claims for Assault and Battery Against the Officers**

7         Mr. Sayavanh alleges state law claims of assault and battery against Officer

8    Cullens (Compl. ¶¶ 5.1-5.3) and Officer Johnson (*id.* ¶¶ 5.4-5.6).  Defendants argue that

9    these claims must be dismissed because Mr. Sayavanh failed to comply with RCW

10   Chapter 4.96.  (Mot. at 16.)   RCW 4.96.010(1) provides in pertinent part that filing a

11   claim for damages within the time allowed by law is a condition precedent to the

12   commencement of any action claiming damages.  RCW 4.96.010(1).  RCW 4.96.020(1)

13   requires a plaintiff to file a claim against the government entity, as well as its individual

14   agents.  RCW 4.96.020(1).  Defendants claim that Mr. Sayavanh failed to file any claim

15   for damages against either the City or the officers prior to initiating the instant lawsuit.

16   (Mot. at 16.)  In response, Mr. Sayavanh concedes that this argument "appears" to be

17   "well-founded and likely to prevail."  (Resp. (Dkt. # 16) at 5.)  In light of Mr. Sayavanh's

18   concession and the lack of any evidence that he complied with RCW Chapter 4.96, the

19   court grants Defendants' motion for summary judgment with respect to Mr. Sayavanh's

20   state law claims for assault and battery against Officers Cullens and Johnson.

21

22

**D. Mr. Sayavanh's Claim for Vicarious Liability Against the City**

Mr. Sayavanh alleges that the City is liable for Officers Cullens's and Johnson's alleged violations of 42 U.S.C. § 1983 under the doctrine of *respondent superior*. (Compl. ¶¶ 5.12-5.14.)  Defendants argue that this claim must be dismissed based on the Supreme Court's holding in *Monnell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).  (Mot. at 8.)  Mr. Sayavanh admits that this argument "appears" to be "well-founded and likely to prevail."  (Resp. at 5.)  The court agrees.

In *Monnell*, the Court held that local government units were "persons" for purposes of § 1983, but that they could only be held liable where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monnell*, 436 U.S. at 690.  The Court made clear, however, that municipalities "cannot be held liable under § 1983 on a *respondeat superior* theory" and may only be held liable where "action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.* at 691.  Here, Mr. Sayavanh has failed to allege that a policy, practice, or custom of the City led to the alleged constitutional violations by the officers.  Rather, Mr. Sayavanh alleged that the City is liable on a *respondeat superior* theory, which is plainly foreclosed by the Court's holding in *Monnell*.  Accordingly, the court grants Defendants' motion for summary judgment with respect to Mr. Sayavanh's claim against the City.

\\

\\

\\

# E.  CONCLUSION

For the foregoing reasons, the court GRANTS in part and DENIES in part Defendants' motion for summary judgment (Dkt. # 11).

Dated this 23rd day of March, 2012.

_____
JAMES L. ROBART
United States District Judge